# THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### ASHEVILLE DIVISION
### CIVIL CASE NO. 1:11cv66

| | | |
|---|---|---|
| SYNOVUS BANK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **MEMORANDUM OF** |
| | ) | **DECISION AND ORDER** |
| PATRICK COLEMAN, | ) | |
| | ) | |
| Defendant/ | ) | |
| Third-Party Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| SYNOVUS FINANCIAL CORP. d/b/a | ) | |
| NATIONAL BANK OF SOUTH | ) | |
| CAROLINA, et al., | ) | |
| | ) | |
| Third-Party Defendants. | ) | |
| | ) | |

**THIS MATTER** is before the Court on the Third Party Defendant Synovus Financial Corp.'s Motion to Dismiss Defendant's Second Amended Third Party Claims [Doc. 58] and the Plaintiff Synovus Bank's Motion to Dismiss the Defendant's Second Amended Counterclaims [Doc. 60].

## I.  PROCEDURAL BACKGROUND

In August 2007, the Defendant Patrick Coleman borrowed money from the National Bank of South Carolina ("NBSC") to finance his purchase of an undeveloped lot in a residential development known as the Seven Falls Golf & River Club ("Seven Falls") in Henderson County, North Carolina.  On April 1, 2011, after the Defendant failed to repay the loan, the Plaintiff Synovus Bank -- the successor-in-interest through name change and merger with NBSC -- initiated this action.  [Doc. 1].[1]

The Defendant filed an Answer/Counterclaim and Third Party Complaint on June 1, 2011, naming Synovus Financial Corp., as well as the developer of Seven Falls, Keith Vinson ("Vinson"), and other related Seven Falls corporate entities as third party defendants.[2]  [Doc. 7].  The Defendant filed an Amended Answer/Counterclaim and Third Party Complaint on August 2, 2011 [Doc. 18] and a Second Amended Answer/Counterclaim and Third Party

---

[1]Synovus Bank is a Georgia state chartered bank.  [Id. at ¶ 1]. Synovus Bank and NBSC will be referred to herein as "the Bank."

[2]The Defendant alleges that Third-Party Defendant Keith Vinson was the principal in multiple companies purportedly formed for the purpose of developing Seven Falls, including Seven Falls, LLC; Seven Falls Real Estate, LLC; Seven Falls Realty, LLC; Seven Falls Golf Club, LLC; Seven Falls Golf & River Club, LLC; Seven Falls Club Amenities, LLC; Seven Falls Lodging, LLC; Seven Falls Ventures, LLC; Seven Falls Property Owners Association, Inc.; Mountain Development Company, LLC; and Zeus Investments, LLC.  [Second Amended Counterclaim/Third Party Complaint ("Counterclaim"), Doc. 53 at ¶ 5].

2

Complaint on December 7, 2011 [Doc. 53]. Synovus Bank and Synovus Financial Corp. now move to dismiss the Defendant's Counterclaims and Third Party Claims, as amended. [Docs. 58, 60]. The Defendant has responded to the Motions to Dismiss [Docs. 62, 63], and Synovus Bank and Synovus Financial Corp. have filed Replies [Docs. 64, 65].

Having been fully briefed, this matter is ripe for disposition.

## II.    STANDARD OF REVIEW

In reviewing a motion to dismiss filed pursuant to Rule 12(b)(6), the Court is guided by the Supreme Court's instructions in Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) and Ashcroft v. Iqbal, 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). As the Fourth Circuit has noted, "those decisions require that complaints in civil actions be alleged with greater specificity than previously was required." Walters v. McMahen, 684 F.3d 435, 439 (4th Cir. 2012).

In order to survive a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Iqbal, 556 U.S. at 678, 129 S.Ct. 1937 (2009) (quoting Twombly, 550 U.S. at 570, 127 S.Ct. 1955). To be "plausible on its face," a plaintiff must demonstrate more than "a sheer

3

possibility that a defendant has acted unlawfully." Iqbal, 556 U.S. at 678, 129 S.Ct. 1937.

In reviewing the complaint, the Court must accept the truthfulness of all factual allegations but is not required to assume the truth of "bare legal conclusions." Aziz v. Alcolac, Inc., 658 F.3d 388, 391 (4th Cir. 2011). "The mere recital of elements of a cause of action, supported only by conclusory statements, is not sufficient to survive a motion made pursuant to Rule 12(b)(6)." Walters, 684 F.3d at 439.

To survive a Rule 12(b)(6) motion, "a complaint must state a 'plausible claim for relief.'" Id. (quoting Iqbal, 556 U.S. at 678, 129 S.Ct. 1937). Determining whether a complaint states a plausible claim for relief is "a context-specific task," Francis v. Giacomelli, 588 F.3d 186, 193 (4th Cir. 2009), which requires the Court to assess whether the factual allegations of the complaint are sufficient "to raise a right to relief above the speculative level," Twombly, 550 U.S. at 555, 127 S.Ct. 1955. As the Fourth Circuit has recently explained:

> To satisfy this standard, a plaintiff need not forecast evidence sufficient to prove the elements of the claim. However, the complaint must allege sufficient facts to establish those elements. Thus, while a plaintiff does not need to demonstrate in a complaint that the right to relief is probable, the complaint must advance the

4

> plaintiff's claim across the line from conceivable to
> plausible.

Walters, 684 F.3d at 439 (citations and internal quotation marks omitted).

## III.  FACTUAL BACKGROUND

Viewing the allegations of the Second Amended Counterclaims and Third-Party Complaint as true, the following is a summary of the relevant facts.

On August 15, 2007, the Defendant entered into a Reservation for Purchase and Sale Agreement ("Purchase Agreement") with Seven Falls, LLC ("the Developer") for the purchase of Lot 52 in the Seven Falls subdivision. [Purchase Agreement, Doc. 61-1].[3]  The Purchase Agreement identifies the Developer as the "Seller" of the Lot and the party promising to "convey marketable title" to the Defendant.  [Id. at Preamble and Part II ¶ 5]. The Purchase Agreement further states that the Developer was obligated to complete paved roads, utility infrastructure, and various recreational facilities, including a golf course.  [Id. at Part II ¶ 12].  The Defendant specifically acknowledged that the "Seller [Seven Falls, LLC] shall be the sole party

---

[3]The exhibits submitted with the Bank's Motion are "integral to and explicitly relied on in" the Defendant's Counterclaim/Third Party Complaint and the authenticity of such exhibits is not challenged.  See Am. Chiropractic Ass'n v. Trigon Healthcare, Inc., 367 F.3d 212, 234 (4th Cir. 2004).  Therefore, the Court will consider these exhibits, but such consideration does not convert this to a motion for summary judgment.

5

responsible for the performance of Seller's obligation under this Agreement."

[Id. at Part II ¶ 16]. Additionally, the Defendant acknowledged

> that no other person, firm or entity, including, without limitation, any entity affiliated with Seller, shall have any obligation or liability under this Agreement. Purchaser, therefore, waives all claims against all companies and persons affiliated with Seller for any loss, cost or damage arising out of Seller's performance or non-performance of its obligations to Purchaser in connection with this Agreement . . . .

[Id.].

To finance his purchase of the Lot, on August 28, 2007, the Defendant executed a promissory note ("Note") in favor of NBSC in the principal amount of $225,000, secured by a Deed of Trust on the Lot. [Note and Deed of Trust, Docs. 61-2 and 61-3]. The Defendant executed a Renewal Note on May 22, 2009. [Renewal Note, Doc. 61-4].

The Defendant contends that he was "fraudulently induced into investing in Seven Falls" [Counterclaim, Doc. 53 at ¶ 1] by an "aggressive marketing scheme" in which the Bank participated with the Developer. [Id. at ¶ 12]. He specifically alleges that the Bank entered into a joint venture with the Developer which included nearly $90,000,000 in development loans, participation by the Bank in marketing activities, the promotion of the Bank as the primary or preferred lender for lot purchase loans, and other similar

6

conduct. [Id. at ¶ 11]. The Defendant further asserts that the Bank failed, *inter alia*, to ensure that the Developer had "appropriate experience, competence, and capitalization" and to inspect the progress of construction, while continuing to approve construction draws. [Id. at ¶¶ 26, 27].

The Defendant also accuses the Bank of "aggressive lending practices," allegedly promoting low-quality loans to inflate short-term profits and increase release fees.[4] [Id. at ¶ 23]. According to the Defendant, the Bank "was attempting to take advantage of the rapid increase in inflation adjusted real estate prices that occurred in the United States from 2003 through 2007, which time period has been widely described as a real estate boom...." [Id.]. He then alleges damages based on the Bank's decision to cancel $63,000,000 "of its publicly recorded financial commitment to Seven Falls," supposedly because it "never intended to fully fund" the $90,000,000 pledged, and because it "preferred to take TARP[5] benefits from the federal government instead of ensuring that these funds went to the benefit of Seven Falls." [Id. at ¶ 22].

---

[4]The Defendant apparently uses the term "release fees" to refer to payments made by the Developer to the Bank upon the sale of a lot to an individual purchaser. [See Counterclaim, Doc. 53 at ¶ 23 and ¶ 8].

[5]"TARP" refers to the Troubled Asset Relief Program, a federal program enacted in 2008 pursuant to which the federal government purchases assets and equity from struggling financial institutions. See generally http://www.federalreserve.gov.

7

## IV.    ANALYSIS

### A.    Synovus Bank's Motion to Dismiss

#### 1.    Plausibility of Defendants' Counterclaims

Synovus Bank first moves to dismiss the Defendant's Second Amended Counterclaims on the ground that they fail to meet the plausibility standards of Twombly and Iqbal.  Specifically, the Bank argues that the basic premise of the Defendant's Counterclaims -- that a bank would collude with a developer to induce individuals to buy lots at inflated prices and that a bank would knowingly accept the overvalued land as collateral for loans -- is so contrary to the Bank's long-term business interests as to be implausible as a matter of law.  [Doc. 61 at 5-8].

In support of this argument, the Bank relies on numerous district court decisions, including Feeley v. Total Realty Management, 660 F.Supp.2d 700 (E.D. Va. 2009), Goldstein v. Bank of America, No. 1:09cv329, 2010 WL 1252641 (W.D.N.C. Jan. 10, 2010) (Howell, M.J.), and Bank of America v. Lykes, No. 1:09cv435, 2010 WL 2640454 (W.D.N.C. May 20, 2010) (Howell, M.J.), which dismissed similar claims against lenders as implausible.  In each of these cases, however, the court determined that the plaintiffs had failed to allege specific facts to support their claims and had failed to make plausible

8

allegations to support the theory that a lender would be willing to collude or conspire with a developer to make under-collateralized loans to borrowers to the detriment of the lender's own financial interests. See Feeley, 660 F.Supp.2d at 708; Goldstein, 2010 WL 1252641, at *5; Lykes, 2010 WL 2640454, at *6. By contrast, in the present case, the Defendant's allegations, when assumed to be true, establish a plausible reason (i.e., the desire for short-term profitability) for the Bank's willingness to knowingly make an under-collateralized loan to the Defendant, even if such loan may have been, as argued by the Bank, contrary to the Bank's long-term financial interests. As such, the Court finds that Feeley, Goldstein, and Lykes are distinguishable from the case at bar.

As this Court recently explained in a similar case:

> As the events of the recent economic crisis have demonstrated, financial institutions do not always make the most prudent business decisions, and they may accept what would otherwise appear to be unreasonable economic risks for the sake of immediate, short-term profitability. Thus, while the Bank's conduct, as alleged by the Defendant[ ], may not appear to have been the most prudent course of action for the Bank to take in terms of its long-term business interests, that certainly does not mean that such conduct is not plausible as a matter of law. Indeed . . . Synovus Bank would not be the first corporation in the history of modern economics to undertake an action that carried substantial risk to its

9

> long term financial viability in order to increase short
> term profits or revenue.

<u>Synovus Bank v. Karp</u>, No. 1:10cv172, slip op. at 20 (W.D.N.C.) (citation and

quotation marks omitted).  Construing the well-pled factual allegations of the

Counterclaims and Third Party Claims in the light most favorable to the

Defendant, the Court concludes that the Defendant's theory of liability is not

so implausible as to warrant dismissal of his claims.  For these reasons, the

Bank's Motion to Dismiss the Defendant's Counterclaims as implausible is

denied.

### 2.    Federal Claim under ILSA

Synovus Bank moves to dismiss the Defendant's counterclaim under the

Interstate Land Sales Full Disclosure Act ("ILSA").  [Doc. 61 at 11-13].  The

ILSA creates a private right of action against "developers" and "agents of

developers" in connection with sales or leases made in violation of its

provisions.  15 U.S.C. § 1709.  The Act "is designed to prevent false and

deceptive practices in the sale of unimproved tracts of land by requiring

developers to disclose information needed by potential buyers."  <u>Flint Ridge</u>

<u>Dev. Co. v. Scenic Rivers Ass'n of Okla.</u>, 426 U.S. 776, 778, 96 S.Ct. 2430,

2433, 49 L.Ed.2d 205 (1976).  "The Act also requires sellers to inform buyers,

prior to purchase, of facts which would enable a reasonably prudent individual

to make an informed decision about purchasing a piece of real property." Burns v. Duplin Land Dev., Inc., 621 F.Supp.2d 292, 301 (E.D.N.C. 2009). A "developer" is defined under the ILSA as "any person who, directly or indirectly, sells or leases, or offers to sell or lease, or advertises for sale or lease any lots in a subdivision . . . ." 15 U.S.C. § 1701(5). An "agent" is defined as "any person who represents, or acts for or on behalf of, a developer in selling or leasing, or offering to sell or lease, any lot or lots in a subdivision. . . ." 15 U.S.C. § 1701(6).

Lending institutions acting in the ordinary course of their business are generally not considered developers within the meaning of the ILSA. See Cumberland Cap. Corp. v. Harris, 621 F.2d 246, 251 (6th Cir. 1980); Kenneally v. Bank of Nova Scotia, 711 F.Supp.2d 1174, 1191-92 (S.D. Cal. 2010) (collecting cases); Hammar v. Cost Control Mktg. and Sales Mgmt. of Va., Inc., 757 F.Supp. 698, 702 (W.D. Va. 1990). "It is only where a financial institution acts beyond its ordinary course of dealing as a lending institution and participates in the actual development, marketing or sale of property that liability may arise under ILSA." Thompson v. Bank of Am., No. 7:09-CV-89-H, 2011 WL 1253163, at *1 (E.D.N.C. Mar. 30, 2011) (citations omitted).

11

In arguing for dismissal of this claim, the Bank cites to Magistrate Judge Howell's Memorandum and Recommendation in <u>Synovus Bank v. Karp</u>, No. 1:10cv172 (W.D.N.C. Oct. 5, 2011), which was recently adopted by this Court, in which Judge Howell recommended dismissing the defendants' ILSA counterclaims against Synovus Bank. The <u>Karp</u> case, however, is distinguishable from the case at bar. In <u>Karp</u>, the defendants alleged that a Bank employee appeared at off-site sales events, made statements regarding the quality of the lots as investments, and made one statement that the Bank was one of the major funders of the development. The Magistrate Judge concluded that these allegations did not rise to the level of showing that the Bank "was so involved in advertising the lots for sale that it went beyond its function as a commercial bank and could be considered a developer under the ILSA." <u>Karp</u>, No. 1:10cv172, slip op. at 18.

By contrast, the Defendant in the present case alleges that the Bank co-hosted a series of marketing events which were designed to promote the sale of lots in Seven Falls and to convince potential purchasers of the development's financial viability. [Counterclaim, Doc. 53 at ¶¶ 13, 14, 16, 18, 20, 21]. The Defendant further alleges that the Bank provided financing for a series of DVDs produced by the Developer which marketed Seven Falls to

consumers.  [Id. at ¶ 13].  These allegations, when taken as true, create a plausible basis for the Defendant's claim that the Bank's activities constitute "a level of involvement and participation in the development activities . . . that goes beyond the ordinary course of dealing of commercial banks." Hammar, 757 F.Supp. at 703.

While denying the Plaintiff's motion to dismiss as to this claim, the Court notes that the Defendant's allegations in support of his ILSA claim are rather thin.  Beyond alleging the "hosting" of several sales events and the "financing" of promotional DVDs, the Defendant offers little meaningful detail regarding the Bank's involvement in the marketing and sale of the Seven Falls development.  While these allegations are meager, the Court is mindful that, despite the somewhat more stringent pleading standards now required under Iqbal, surviving a Rule 12(b)(6) motion remains a relatively low bar.  A party must allege sufficient facts to state a only a *plausible* claim for relief, and for the reasons stated above, the Court concludes that the Defendant has done so in this case.  Of course, it remains to be seen whether the Defendant can present a forecast of evidence to establish that the Bank's participation in the development, marketing, and sale of Seven Falls rises to the level such that

13

liability can be imposed under the ILSA, and the Court expresses no opinion on that issue at this time.

In sum, the Defendant's allegations are sufficient to establish a plausible claim that the Bank stepped outside of its ordinary course of business such that liability could be imposed under the ILSA. Having argued no other basis for the dismissal of this claim, the Bank's motion to dismiss the Defendant's claim under the ILSA must be denied.

### 3. State Law Claims

#### a. Choice of Law

As a federal court sitting in diversity, this Court must apply the substantive law of the forum state, including its choice of law rules. Colgan Air, Inc. v. Raytheon Aircraft Co., 507 F.3d 270, 275 (4th Cir. 2007). Because North Carolina courts apply different choice of law rules depending on the type of claim asserted, the Court first must first characterize the nature of the asserted claims. See Simms Inv. Co. v. E.F. Hutton & Co., 688 F.Supp. 193, 197 (M.D.N.C. 1988) ("In a conflict of laws situation, a court must determine at the outset whether the problem presented to it for resolution relates to torts, contracts, property, or some other field, or to a matter of substance or

14

procedure, in order to refer to the appropriate law.") (quoting 16 Am.Jur.2d Conflict of Laws § 3 (1979)).

For contractual claims, North Carolina courts generally apply the law of the place where the contract was made. See Norman v. Tradewinds Airlines, Inc., 286 F.Supp.2d 575, 584 (M.D.N.C. 2003). Further, where the contracting parties have agreed "that a given jurisdiction's substantive law shall govern the interpretation of the contract, such a contractual provision will be given effect." Tanglewood Land Co. v. Byrd, 299 N.C. 260, 262, 261 S.E.2d 655, 656 (1980). Here, the Promissory Note at issue states that "[a]ny legal questions in this agreement will be decided by South Carolina law." [Note, Doc. 61-2 at 3]. The parties appear to be in agreement that this choice of law provision makes South Carolina law applicable to the Defendant's counterclaim for breach of contract.

The parties differ, however, on the appropriate law to be applied to the non-contractual counterclaims. The Bank contends that the law of South Carolina is applicable to these claims, as South Carolina is the Defendant's state of residence and thus should be considered the site of his alleged financial injury. The Defendant contends, on the other hand, that the law of North Carolina governs these state law claims. [Doc. 63 at 1]. In arguing for

15

the application of North Carolina law, the Defendant relies upon the choice of law provision in the Promissory Note. The Defendant argues that application of South Carolina choice of law rules pursuant to this contractual choice of law provision would require the Court to apply North Carolina law to his claims, because the relevant acts occurred in North Carolina and the property is located here. [Doc. 63 at 1].

The Defendant's argument that the choice of law provision in the Promissory Note is determinative of this choice of law issue is misplaced. A choice of law provision in a contract generally requires use of a certain state's substantive law, not the state's conflict of laws principles. See e.g., Johnston County v. R.N. Rouse & Co., 331 N.C. 88, 92, 414 S.E.2d 30, 33 (1992) ("[A] choice of law provision[ ] names a particular state and provides that the substantive laws of that jurisdiction will be used to determine the validity and construction of the contract, regardless of any conflicts between the laws of the named state and the state in which the case is litigated."). Further, the scope of the choice of law provision contained in the Note is limited to disputes *arising under* the terms of that specific document. It does not dictate the choice of law applicable to all disputes between the parties. See ITCO Corp. v. Michelin Tire Corp., Commercial Div., 722 F.2d 42, 49 n.11 (4th Cir.

16

1983) (holding that choice of law provisions in contract did not apply to claims arising out of tort and where claims did not involve any issue of contractual construction, interpretation, or enforceability).

In North Carolina, courts traditionally apply the rule of *lex loci delicti* to tort claims.  See Boudreau v. Baughman, 322 N.C. 331, 335, 368 S.E.2d 849, 853-54 (1988) "For actions sounding in tort, the state where the injury occurred is considered the situs of the claim." Id. at 335, 368 S.E.2d at 854. Similarly, in cases involving claims for unfair or deceptive trade practice, North Carolina courts have applied the law of the state where the injuries were sustained.  See ITCO, 722 F.2d at 49 n.11; Lloyd v. Carnation Co., 61 N.C. App. 381, 387-88, 301 S.E.2d 414, 418 (1983); United Va. Bank v. Air-Lift Assoc., 79 N.C. App. 315, 321, 339 S.E.2d 90, 94 (1986).

In cases involving financial injuries, courts have considered the injury to be sustained "where the economic loss was felt."  Clifford v. Am. Int'l Specialty Lines Ins. Co., No. 1:04CV486, 2005 WL 2313907, at *8 (M.D.N.C. Sep. 21, 2005).  While the economic loss may be suffered in the state of the plaintiff's residence or principal place of business, courts routinely have rejected applying a bright line rule in determining the situs of the injury.  See Harco Nat'l Ins. Co. v. Grant Thornton LLP, 206 N.C. App. 687, 697, 698

17

S.E.2d 719, 725-26 (2010) ("[A] significant number of cases exist where a plaintiff has clearly suffered its pecuniary loss in a particular state, irrespective of that plaintiff's residence or principal place of business. In those cases, the lex loci test requires application of the law of the state where the plaintiff has actually suffered harm."); see also United Dominion Indus. v. Overhead Door Corp., 762 F.Supp. 126, 130 (W.D.N.C. 1991) (noting that in commercial actions, "determining the place that the injury occurred is not especially self-evident").

Applying these principles to the present case, the Court concludes that North Carolina law is applicable to the Defendant's claims. While the Defendant is a resident of South Carolina, his alleged pecuniary losses were clearly suffered in North Carolina, as the real estate at issue is located here and the purchase transaction was completed here. See United Dominion Indus., 762 F.Supp. at 130-31 (holding that Texas law applied to unfair and deceptive trade practice claim because closing of sale took place in Texas); United Va. Bank, 79 N.C. App. at 321, 339 S.E.2d at 94 (holding that Virginia law applied where bank's wrongful sale of collateral occurred in Virginia). Accordingly, the Court will apply North Carolina law to the Defendant's non-contractual counterclaims.

### b.    Joint Venture and Apparent Agency Theories

Synovus Bank argues that, to the extent that the Defendant's Counterclaims rely upon a theory of a joint venture or apparent agency, such claims are not supported by well-pled factual allegations and thus fail as a matter of law.  [Doc. 61 at 8-11].

To establish a joint venture under North Carolina law, "there must be (1) an agreement, express or implied, to carry out a single business venture *with joint sharing of the profits*, and (2) *an equal right of control* of the means employed to carry out the venture."  Southeastern Shelter Corp. v. BTU, Inc., 154 N.C. App. 321, 326, 572 S.E.2d 200, 204 (2002) (citation and internal quotation marks omitted) (emphasis in original).  In the present case, the Defendant's allegations of a joint venture between the Bank and the Developer are legally insufficient with respect to both elements.  As to the first element, the Defendant's factual allegations establish, at most, that the relationship between the Bank and the Developer was that of a lender and borrower.  [See, e.g., Counterclaim, Doc. 53 at ¶ 11(a) (loans to Developer), ¶ 11(c) (joint promotion of NBSC as primary or preferred lender)].  Such a relationship between a bank and developer standing alone is insufficient to establish a joint venture as a matter of law.  See Edwards v. Northwestern

19

Bank, 39 N.C. App. 261, 276, 250 S.E.2d 651, 661 (1979).  As the Edwards Court noted, to find a joint venture based on the existence of a mere debtor/creditor relationship "would seriously disrupt the carefully constructed system of secured financing."  Id. at 277, 250 S.E.2d at 662.

Further, the Defendant's conclusory allegation, made "upon information and belief," that the Bank and Developer shared profits [Id. at ¶ 11(h)], is contradicted by other allegations, which make clear that the "shared profits" were actually release fees paid to the Bank on specific lot purchases.  [Id. at ¶¶ 8, 23].  The fact that the Bank may have received release fees when the Developer closed a sale on a lot, as a matter of law, does not amount to a sharing of profits with the Developer.  See Reeve & Assocs., Inc. v. United Carolina Bank, No. 96 CVS 4695, 1997 WL 33446634, at *3 (N.C. Bus. Ct. Oct. 6, 1997) (concluding that repayment of debt owed by debtor to lender does not constitute the "sharing of profits" for purposes of a joint venture).

The Defendant also fails to make adequate factual allegations to support a finding of an equal right of control between the parties.  The Defendant specifically fails to make any allegation that the Developer had any right to exercise control over the actions of NBSC.  While he alleges that NBSC had "control of the money disbursed to Developer and thereby control of the

20

implementation of the project" [see Counterclaim, Doc. 53 at ¶ 11(k)], this allegation, without more, is not sufficient to support a joint venture. See Andrews v. Primus Telecomms. Group, Inc., 107 F. App'x 301, 306 (4th Cir. 2004) (per curiam) (applying Virginia law; rejecting argument that control element was established when one party's financial investment in the other party was necessary for the continuing viability of the other party).

The Defendant's joint venture allegations are also expressly contradicted by the terms of the Purchase Agreement, which acknowledged that the *Developer* was "the sole party responsible for the performance of Seller's obligation under this Agreement ," and by which the Defendant waived "all claims" against "all companies and persons affiliated with" the Developer for "any loss, cost or damage" arising out of the Developer's failure to complete the construction of infrastructure and amenities at Seven Falls. [Purchase Agreement, Doc. 61-1 at Part II ¶ 16]. For all of these reasons, the Court concludes that the Defendant's theory of a joint venture between the Bank and the Developer must fail.

The Defendant also alleges that the Bank is liable for any action of the Developer under a theory of apparent agency, agency by estoppel, or estoppel to deny joint venture. [See Counterclaim, Doc. 53 at ¶¶ 83-86].

Apparent agency, which is also known as agency by estoppel, is a type of equitable estoppel. <u>Deal v. N.C. State Univ.</u>, 114 N.C. App. 643, 645, 442 S.E.2d 360, 362, <u>disc. rev. denied</u>, 336 N.C. 779, 447 S.E.2d 419 (1994). "Equitable estoppel arises when one party, by his acts, representations, or silence when he should speak, intentionally, or through culpable negligence, induces a person to believe certain facts exist, and that person reasonably relies on and acts on those beliefs to his detriment." <u>Id.</u> When estoppel is applied in the agency context, the rule provides that "[w]here a person by words or conduct represents or permits it to be represented that another person is his agent, he will be estopped to deny the agency as against third persons who have dealt, on the faith of such representation, with the person so held out as agent, even if no agency existed in fact." <u>Id.</u> (quoting <u>Hayman v. Ramada Inn, Inc.</u>, 86 N.C. App. 274, 278, 357 S.E.2d 394, 397, <u>disc. review denied</u>, 320 N.C. 631, 360 S.E.2d 87 (1987)).

In the present case, the Defendant has not identified any representations made by the Bank that purportedly induced him into believing that the Bank and the Developer were in either a joint venture or an agency relationship. Additionally, the express terms of the Purchase Agreement make clear that only the Developer had any duty to finish the infrastructure

22

and amenities, thus negating any claim that the Defendant reasonably believed the Bank was in a joint venture with the Developer to develop the subdivision. For these reasons, the Court concludes that the Defendant's reliance on a theory of apparent agency or estoppel to allege any claims against the Bank based on the conduct of the Developer must fail.

### c. Breach of Fiduciary Duty and Constructive Fraud

Synovus Bank moves to dismiss the Defendant's counterclaims for breach of fiduciary duty and constructive fraud, arguing that these claims must fail because the Bank owed no fiduciary duty to him. [Doc. 61 at 13-14].

Under North Carolina law, it is well-established that "[a] fiduciary duty arises when there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing confidence." Branch Banking & Trust Co. v. Thompson, 107 N.C.App. 53, 60, 418 S.E.2d 694, 699 (internal quotation marks omitted), disc. review denied, 332 N.C. 482, 421 S.E.2d 350 (1992). "However, an ordinary debtor-creditor relationship generally does not give rise to such a special confidence: [t]he mere existence of a debtor-creditor relationship between [the parties does] not create a fiduciary relationship." Id. at 61, 418 S.E.2d 694, 418 S.E.2d at 699 (alterations in original) (internal

23

quotation marks omitted). Nevertheless, the North Carolina Court of Appeals has noted that "[t]his is not to say ... that a bank-customer relationship will never give rise to a fiduciary relationship given the proper circumstances." Id.

Here, the Defendant has failed to allege sufficient facts to establish a fiduciary relationship with the Bank. While he alleges that the Bank gave him "investment advice" and that he "placed special confidence and trust" in the Bank [Counterclaim, Doc. 53 at ¶ 44], such allegations are merely conclusory and fail to provide any specific plausible facts to support his claim. At most, the Defendant's factual allegations establish a normal debtor-creditor relationship between the parties. Accordingly, the Defendant's claim for breach of fiduciary duty must fail.

The lack of a fiduciary relationship is likewise fatal to the Defendant's claim for constructive fraud. See Terry v. Terry, 302 N.C. 77, 83, 273 S.E.2d 674, 677 (1981) ("Constructive fraud . . . arises in circumstances where a confidential relationship exists."). Accordingly, the Defendant's counterclaim for constructive fraud is dismissed.

24

### d.    Negligence/Gross Negligence Claims

Synovus Bank next moves to dismiss the Defendant's counterclaims for negligence and gross negligence, arguing that the Bank had no duty to the Defendant beyond those set forth in the loan agreement.  [Doc. 61 at 15].

"To state a claim for common law negligence, a plaintiff must allege: (1) a legal duty; (2) a breach thereof; and (3) injury proximately caused by the breach."  Stein v. Asheville City Bd. of Educ., 360 N.C. 321, 328, 626 S.E.2d 263, 267 (2006).  "An act or conduct rises to the level of gross negligence when the act is done purposely and with knowledge that such act is a breach of duty to others, i.e., a conscious disregard of the safety of others."  Yancey v. Lea, 354 N.C. 48, 53, 550 S.E.2d 155, 158 (2001).  When a claim for negligence or gross negligence has been asserted, the Court must first determine, as a matter of law, whether the defendant owed a duty of care to the plaintiff.  "If no duty exists, there logically can be neither breach of duty nor liability."  Harris v. Daimler Chrysler Corp., 180 N.C. App. 551, 555, 638 S.E.2d 260, 265 (2006).

In the present case, the Defendant asserts counterclaims for negligence and gross negligence against the Bank, arguing that a duty of care arose between the Bank and the Defendant: (1) as a result of the "investment advice

25

and additional services" offered; (2) as a result of its relationship with the Developer and its "intimate knowledge" of Seven Falls; and (3) as a result of the "customer covenant" made by the Bank, pledging to treat every customer "with the highest levels of sincerity, fairness, courtesy, respect and gratitude" and to provide "the finest personal service and products" to each customer. [Counterclaim, Doc. 53 at ¶ 53]. None of these allegations, however, are sufficient to establish a duty of care beyond those duties set forth in the parties' loan agreement. The Defendant offers no specific factual support for his conclusory allegation that the Bank provided him "investment advice and additional services" which gave rise to such a duty. Further, the Defendant's allegation that the Bank had some duty to oversee the development of Seven Falls on his behalf is without merit. See Camp v. Leonard, 133 N.C. App. 554, 560, 515 S.E.2d 909, 913 (1999) ("a lender is only obligated to perform those duties expressly provided for in the loan agreement to which it is a party").

Finally, the Defendant offers no legal authority to support his contention that the Bank's "customer covenant"[6] created a duty of care on the part of the Bank beyond those duties created by the parties' loan agreement. The Court

---

[6]In another section of his brief, the Defendant argues that this "customer covenant" was included in some unspecified document that was provided to him along with the Note. [Doc. 63 at 19].

26

declines to hold that the Bank had a duty of care arising from what appears to be, at most, an aspirational pledge of quality customer service that was not even included in the parties' contract.

In short, the Defendant has offered no legal or factual basis on which the Court could impose any duty on the Bank beyond those duties expressly provided for in the parties' loan agreement. The Defendant's counterclaims for negligence and gross negligence are therefore dismissed.

### e.    Breach of Contract Claim

In his counterclaim for breach of contract, the Defendant alleges that the Bank is vicariously liable by virtue of its joint venture with the Developer for the Developer's breach of the Purchase Agreement in failing to build infrastructure and amenities as purportedly promised. [Counterclaim, Doc. 53 at ¶¶ 63-64, 67]. Because the Court has concluded that the Defendant has failed to allege a plausible claim for joint venture, this aspect of the Defendant's breach of contract claim must fail.

The Defendant further asserts that the Bank is liable for breaching the Note by failing to adhere to the "customer covenant" discussed above. [Id. at ¶ 61]. While conceding that this "customer covenant" was not part of the Note, the Defendant nevertheless argues that "the document that included this

27

language was provided to Defendants [sic] along with the note." [Doc. 63 at 19]. The Defendant, however, has not produced a copy of the separate document or even alleged what the document was. Furthermore, the Defendant has not alleged any facts to support the conclusory allegation that the parties intended to incorporate the terms of that document into the Note. The Note itself makes no reference to the "customer covenant" contained in this separate document. See Stevens Aviation, Inc. v. DynCorp Int'l LLC, 394 S.C. 300, 307-08, 715 S.E.2d 655, 659 (S.C. Ct. App. 2011) ("the contract must explicitly, or at least precisely, identify the written material being incorporated and must clearly communicate that the purpose of the reference is to incorporate the referenced material into the contract") (citation and internal quotation marks omitted). Even if this unidentified document were incorporated into the parties' agreement, the Defendant cannot claim a breach of a contract based on a general statement of aspirational policy. See Scott v. Merck & Co., No. L-09-3271, 2010 WL 4941994, at *6 (D. Md. Nov. 30, 2010) ("[g]eneral or aspirational policies not susceptible of precise application in individual cases . . . cannot constitute binding contractual terms"). For all of these reasons, the Defendant's counterclaim for breach of contract is dismissed.

### f. Tortious Interference with Contract Claim

In his counterclaim for tortious interference with contract, the Defendant asserts that the Bank is liable for tortiously interfering with his Purchase Agreement with the Developer, specifically by "failing to properly fund [the] Developer and thereby causing [the] Developer not to perform" its contractual obligation to the Defendant to complete the development's infrastructure and amenities. [Counterclaim, Doc. 53 at ¶¶ 75-78]. Notably absent from the Defendant's allegations, however, is any plausible claim that the Bank intentionally acted to procure the breach of the Defendant's contract with the Developer. See Bassett Seamless Guttering, Inc. v. GutterGuard, LLC, 501 F.Supp.2d 738, 742 (M.D.N.C. 2007) (holding that plaintiff asserting claim for tortious interference must allege intentional procurement of breach by third party).

The Defendant further claims, "upon information and belief," that the Bank undertook this course of action so it could obtain TARP funds. [Id. at ¶ 78]. In order to state a claim for tortious interference, however, the Defendant must allege that the Bank's conduct was unjustified. As the North Carolina Court of Appeals has explained:

> A person acts without justification in inducing the breach of contract . . . if he has no sufficient lawful

reason for his conduct. A plaintiff must show that the
defendant was acting not in the legitimate exercise of
his own right, but with a design to injure the plaintiff or
gain some advantage at his expense.

MLC Auto., LLC v. Town of S. Pines, 702 S.E.2d 68, 79 (N.C. Ct. App. 2010)

(internal citations and quotation marks omitted), disc. rev. denied, 365 N.C.

211, 710 S.E.2d 23 (2011). Here, the factual allegations set forth in support

of the Defendant's Amended Counterclaims fail to establish that the Bank's

action was unjustified or otherwise improper such that it would support a claim

for tortious interference. For these reasons, the Defendant's counterclaim for

tortious interference with contract is dismissed.

### g. Violation of Anti-Deficiency Statute Claim

The Defendant asserts that the Bank violated North Carolina's Anti-
Deficiency Judgment Statute, N.C. Gen. Stat. § 45-21.38. [Counterclaim,
Doc. 53 at ¶¶ 79-82]. The Anti-Deficiency Judgment Statute, however,
applies only to purchase money mortgage transactions wherein the seller of
the property finances the buyer's purchase. It does not apply to transactions,
such as the one at bar, in which a buyer receives financing from a third-party
lender. See Childers v. Parker's, Inc., 274 N.C. 256, 263, 162 S.E.2d 481,
485-86 (1968).

30

The Defendant argues that the Anti-Deficiency Judgment Statute nevertheless applies in this case because the Bank was a joint venturer with the seller of the property (i.e., the Developer). [Doc. 63 at 22]. For the reasons already discussed, the Court concludes that the Defendant has not alleged a plausible claim asserting a joint venture between these parties, and thus, his argument that N.C. Gen. Stat. § 45-21.38 somehow "constructively" applies to the present transaction is without merit. The Defendant's counterclaim for violation of the North Carolina Anti-Deficiency Judgment Statute is therefore dismissed.

### h. Unfair and Deceptive Trade Practices Claim

In his Second Amended Counterclaim/Third Party Complaint, the Defendant alleges that the Bank's "actions and false representations" in connection with the sale of lots to consumers, including the Defendant, constitute unfair or deceptive trade practices in violation of the South Carolina Unfair Trade Practices Act, S.C. Ann. Code § 39-5-10, *et seq.* ("SCUTPA"). [Counterclaim, Doc. 53 at ¶¶ 47-51]. Having determined that North Carolina law governs any claim that the Defendant may have for the Bank's unfair and deceptive trade practices, the Defendant's claim under SCUTPA must be dismissed.

The Defendant contends that his claim is nevertheless viable as a Chapter 75 claim under North Carolina law. [Doc. 63 at 14]. In order to establish a violation of Chapter 75, however, a party must show: "(1) an unfair or deceptive act or practice, (2) in or affecting commerce, and (3) which proximately caused injury" to that party. Gray v. N.C. Ins. Underwriting Ass'n, 352 N.C. 61, 68, 529 S.E.2d 676, 681 (2000). Here, the Defendant's Counterclaim/Third Party Complaint fails to specify what acts of the Bank he contends constituted unlawful trade practices. While the Defendant asserts generally that the Bank engaged in unfair or deceptive acts relative to the "sale of lots to consumers" [Counterclaim, Doc. 53 at ¶ 49], the Defendant's allegations fail to demonstrate that the Bank sold the lot to the Defendant or how his decision to purchase the lot from the Developer was caused by the Bank's conduct. The Defendant further alleges that the Bank's "false representations" constituted unfair or deceptive trade practices. [Id. at ¶ 50]. The Defendant fails to allege, however, any specific misrepresentations that were made to him or how he suffered any actual damages in reliance on these alleged misrepresentations.

In his opposition to the Motion to Dismiss, the Defendant cites three categories of conduct described in the Second Amended Counterclaim/Third

Party Complaint that constitute unfair or deceptive trade practices by the Bank: (1) the Bank's withdrawal of funding for the project without notice after previously showing its support for the development; (2) the Bank's engaging in "improper internal procedures"; and (3) the Bank's making of "false representations" that induced the Defendant to buy his lot. [Doc. 63 at 14-16]. These categories of conduct, however, fail to describe any unfair or deceptive acts. The Bank's decision to cancel the funding for the development was not unfair or deceptive as to the Defendant. As stated in the Purchase Agreement, it was the obligation of the *Developer* to build the development, not the Bank.

The Defendant makes only general, conclusory allegations regarding "improper internal procedures" and "false representations" and utterly fails to identify any specific misrepresentations made to him or any other specific conduct which he contends constitutes an unlawful trade practice. Because it is supported by only conclusory allegations, the Defendant's claim for unfair and deceptive trade practices must be dismissed.

### i. Equitable Estoppel Claim

The Defendant asserts that the Bank "should be equitably estopped" from enforcing the Note. [Counterclaim, Doc. 53 at ¶ 74]. According to the

Defendant, the Bank "made misleading representations to and concealed material facts from [him] in order to entice [him] to enter into both the contract to purchase real property in Seven Falls and the promissory note at issue in this litigation." [Id. at ¶ 69].

The Defendant has not alleged a basis for estoppel because he has failed to allege with any specificity the false representations or concealment of material fact that the Bank purportedly made, or to describe how he reasonably relied on them to his detriment. See Deal, 114 N.C. App. at 645, 442 S.E.2d at 362. As such, the Defendant's counterclaim for equitable estoppel is dismissed.

## B. Synovus Financial Corp.'s Motion to Dismiss

Third Party Defendant Synovus Financial Corp. moves to dismiss the claims as stated in the Defendant's Second Amended Third Party Complaint on the ground that such claims fail to state a claim upon which relief may be granted against Synovus Financial Corp. [Doc. 58].

The Defendant asserts claims throughout his Counterclaims and Third Party Complaint against Synovus Bank, NBSC, and Synovus Financial Corp. without differentiating between these corporate entities. Thus, to the extent that the Court has concluded that the counterclaims against Synovus Bank

34

should be dismissed, the Court likewise concludes that the third party claims against Synovus Financial Corp. should be dismissed as well.

Additionally, however, the Court concludes that the Defendant has failed to state any plausible basis for imposing liability on Synovus Financial Corp. In the Second Amended Counterclaim/Third Party Complaint, the Defendant alleges that Synovus Financial Corp. is just one of "many names" under which the Plaintiff Synovus Bank does business. [See Counterclaim, Doc. 53 at ¶ 4]. Notably, the Defendant does not allege any specific actions by Synovus Financial Corp. in relation to the Defendant or any of his claims beyond those actions allegedly committed by Synovus Bank/NBSC.

In opposition to the Motion to Dismiss, the Defendant argues that Synovus Financial Corp. was added as a party to this action because "it is unclear who now owns NBSC" and thus "it is difficult for Defendants [sic] to discern the proper party." [Doc. 62 at 2]. The Defendant's Second Amended Counterclaim/Third Party Complaint, however, does not allege any legal or factual basis to hold Synovus Financial Corp. derivatively liable for the alleged actions of NBSC. To the extent that the Defendant attempts to assert liability on the basis of Synovus Financial Corp.'s possible ownership of NBSC, the Defendant fails to make any allegation in the Second Amended

Counterclaim/Third Party Complaint regarding Synovus Financial Corp.'s alleged ownership. Even if such allegation had been asserted, however, it would not be sufficient to state a claim against Synovus Financial Corp., as mere ownership is not sufficient to render a parent corporation liable for the acts of its subsidiary. See Fischer Inv. Corp., Inc. v. Catawba Dev. Corp., 200 N.C. App. 644, 650, 689 S.E.2d 143, 147 (2009) (holding that to pierce corporate veil under the instrumentality rule requires showing, among other things, of "complete domination" of corporate entity such that the entity had "no separate mind, will, or existence of its own") (citation omitted). Having failed to allege any plausible basis for imposing liability on Synovus Financial Corp. for the conduct of NBSC, the Defendant's third party claims against Synovus Financial Corp. are dismissed.


**O R D E R**

**IT IS, THEREFORE, ORDERED** that the Third Party Defendant Synovus Financial Corp.'s Motion to Dismiss Defendant's Second Amended Third Party Claims [Doc. 58] is **GRANTED**, and the Defendant's Second Amended Third Party Claims against Synovus Financial Corp. are hereby **DISMISSED WITH PREJUDICE**.

36

**IT IS FURTHER ORDERED** that the Plaintiff Synovus Bank's Motion to Dismiss the Defendant's Second Amended Counterclaims [Doc. 60] is **GRANTED IN PART** and **DENIED IN PART**. Specifically, the Bank's Motion to Dismiss the Defendant's ILSA claim is **DENIED**. In all other respects, the Bank's Motion to Dismiss is **GRANTED**, and all of the Defendant's Counterclaims, with the exception of his ILSA claim, are **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that the parties shall conduct an initial attorneys' conference within fourteen (14) days of the entry of this Order and shall file a Certificate of Initial Attorneys' Conference within seven (7) days thereafter.

**IT IS SO ORDERED.**

Signed: August 15, 2012

Martin Reidinger
United States District Judge